THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVEN JOSEPH TILLMAN, Defendant-Appellant.—(THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EARL LEE MIMS, Defendant-Appellant.)

(No. 11158; ▮▮▮▮▮▮▮▮)

Fourth District—January 7, 1971.

TRAPP, J., dissenting.

Harold L. Jensen of Hatch, Corazza, Baker & Jensen, of Champaign, for appellants.

Lawrence E. Johnson, State's Attorney, of Urbana, (Kenneth E. Baughman, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

This is an appeal by Steven Joseph Tillman and Earl Lee Mims from findings of guilty in a bench trial and sentences of thirty-five to fifty years for murder, five to fifteen years for attempted murder, and five to twenty years for armed robbery, the sentences to run concurrently.

Defendants were indicted under sections 9—1, 8—4 and 18—2 of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, pars. 9—1, 8—4 and 18—2). The State's theory was that defendants were accountable under section 5—2 of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, par. 5—2(c) as accomplices to the crime of armed robbery committed by Franklin Johnson and Andrew Allen, and therefore parties to the crime of murder, as principals, as defined in section 9—1(a)(3) and of attempted murder, as principals, as defined in section 8—4(a) of the Criminal Code, committed by Johnson and Allen.

Defendants contend that the evidence does not prove beyond a reasonable doubt the intent required of them in section 5—2 of the Criminal Code, that

"* * * A person is legally accountable for the conduct of another when: * * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. * * *"

Further, defendants contend that the evidence does not prove beyond a reasonable doubt that defendants in any way promoted or facilitated, solicited, aided, abetted, agreed or attempted to aid in the commission of the crimes charged.

Defendants further contend that the evidence does not prove their accountability beyond a reasonable doubt when considered in light of the fact that a finding of accountability in a robbery will automatically, although fictionally, result in a finding of intent of murder where murder occurs in the course of the robbery. Defendants further urge that the statute of felony-murder should be interpreted so as not to lead to a harsh result and should be modified, limited or abolished by judicial

interpretation to provide that murder in the course of a dangerous felony creates only a rebuttable presumption of one of the mental states set forth in section 9—1(a)(1) and (2) of the Criminal Code. Defendants further urge that the sentences imposed are harsh and excessive in view of defendants' nonparticipation in the crimes.

These contentions require a somewhat detailed examination of the evidence in this case.

On the morning of September 8, 1968, the defendants were asked by their acquaintances, Johnson and Allen, to accompany them from Chicago to Mounds, Illinois. Having no money, defendants first declined, but upon assurance by Johnson and Allen that they had money and would take care of things, they accepted. The four drove to Mounds. However, upon discovering the distance of the trip, defendants made several requests to return to Chicago, as Mims had to be back for classes in high school Monday morning and Tillman had to be back on his job Monday morning.

Sunday evening, when defendants again met Allen and Johnson in Mounds, defendants insisted upon returning to Chicago. Before returning, Allen and Johnson went to the home of Allen's grandfather and obtained a .22-caliber pump-action rifle. Defendants, at this point, became aware that Allen and Johnson were "high" from narcotics. Thus, Tillman drove the car on the return trip.

While en route to Chicago, Johnson shot and fatally wounded one Beatrice Smith, and Allen shot and wounded, but did not kill, her companion, George Menard, at a roadside rest area. Johnson and Allen took money from the man and woman as well as certain other items of personal property. It is in connection with these crimes that defendants were indicted, found guilty and sentenced.

Allen and Johnson testified in this case as witnesses for the prosecution and statements taken at the Pulaski County Courthouse, Mound City, Illinois, on September 15, 1968, from the defendants Tillman and Mims were admitted into evidence.

From the statement of Tillman it appears that on the return trip from Mounds Tillman drove, with Allen in the front passenger seat and Johnson and Mims in the rear seat. While en route north both Tillman and Allen saw a car parked in a roadside rest area on the left (or west) side of the northbound highway. Tillman slowed down and on Allen's instructions turned the car around and drove south past the parked car. Allen told Tillman to stop the car. He did, and Johnson and Allen got out of the car. Johnson had a rifle and Allen a pistol, which they had been holding. Tillman then drove north past the parked automobile and some distance from the rest area stopped the car. He said he heard

no conversation from the rest area but did hear five or six shots. Tillman, in his statement, further stated that quite some time before they reached the rest area, Allen and Johnson had talked about getting another car because Tillman and Mims didn't want to go through what they did. He also stated that at a filling station prior to passing the rest area, the parties saw a Lincoln Continental, and that Allen had wanted to take it. Tillman stated that he and Mims dissuaded the taking of this car. He said that it was his intention, at the rest area, to wait until Allen and Johnson were out of the car, then to run off and leave them. Tillman stated that at a prior place in the trip, Allen threatened to shoot him, and that he replied that if he did so he (Tillman) would run the car off the road.

Tillman, in his statement, further denied he had any knowledge of what transpired at the rest area. He said he heard shots, that the lights on the parked car came on, and it came up the road toward the car he was driving and passed it. He said that he started flicking the lights on his car and blowing the horn; that he caught up with the other car, and asked Allen or Johnson if they were going to leave them. Johnson handed Tillman $2.00 and told Tillman to hand him his jacket. Tillman gave him his jacket. At this point Johnson and Allen pulled ahead, and Tillman and Mims slowed down to let them get ahead. They then proceeded on Route 45 toward Chicago, passing a roadblock where there were police cars with red lights.

Mims, in his statement, related substantially the same facts as Tillman, stating that Tillman was forced to stop the car; that neither he nor Tillman were close to the vehicle parked at the roadside area; that the car in which Tillman and Mims were was two blocks or a block and a half north of the roadside parking area. He further stated that he could see nothing of what was going on back at the vehicle. He said he heard six or seven shots. He did not see any people. The statement then reads:

\* \* \*

"A. [Defendant Mims] Me and Steve, we pulled off. . . .and started driving on. They got up with us and started hollering, you know, they just killed, they just killed.

"Q. [Joseph T. Brown, Chief Investigator, Champaign County Sheriff's Department] Who hollered to you 'they just killed, they just killed'?

"A. Well, Frank was the one closest to the window. Steve was driving. Both of them was hollering but Frank was the main one I heard.

"Q. Then what happened?

"A. Then the car stopped.

"Q. Both cars stopped or one car?

"A. Both cars stopped. I don't know if they told Steve or not, but they must have told Steve to stop the car. I was turning on the radio. Steve got out of the car and went up to the car and I guess they exchanged words, but I don't know what they was. He came back and we kept going on. Steve went a little faster. I told Steve to slow down the car because they was going to try to take us and he said thats what he did it for; and they proceeded on.

"[Defendant Mims] We then proceeded on towards Chicago on Route 45, passing through the police road block, where we saw the Pontiac which Franklin Johnson and Andrew Allen had abandoned." (Abst. 19.)

Allen, called by the State, testified they left Mounds in a 1967 Thunderbird; that at some undescribed place they acquired a different automobile—a 1966 Ford Mustang. He testified that as they drove north they had a rifle and a pistol which were passed back and forth in the car. He further testified that at one time he stated he was going to get another car and that none of the occupants made any response except Johnson, who said, "okey [sic]."

Allen testified that when they passed the rest area in Tolono, he saw the parked car. They turned around and drove south past the parked automobile at the rest station and stopped about a block and a half beyond it. He got out and asked for a gun. He said that Mims gave him the revolver. He stated that he and Johnson got out of the automobile and Mims and Tillman stayed in. Johnson had a .22-caliber rifle. Johnson and Allen then went to the rest area where a 1967 Pontiac was parked. He said a man and a woman were in the car; that Johnson and he ordered them out; that Johnson said, "let's kill them." He stated he said, "yeah", and jumped out and shot the man. Johnson shot the woman. Allen stated that he shot the man five times and the man "was running around", but that the woman was lying on her side. He and Johnson then took money from the man and the woman, threw other items of personal property out of the car, took the car and left the rest area in that car—a Pontiac. Allen said, "Steve [Tillman] came and asked us for some money." He said Tillman was in the car across the road; that they gave him some money, and that a jacket was handed to Johnson.

Allen admitted that when he was first arrested he told the authorities that Tillman did some shooting at the scene of the crimes, but he said he later changed his story to the effect that Tillman didn't get out of the car. He also said that neither he nor Johnson told Mims or Tillman that he (Allen) had shot anyone or had stolen any money. He further stated that he shot himself but told that Tillman shot him, as he "was

trying to get out of . . . [the charges] like everybody else." In other testimony he said Tillman came to the car after the shooting while the car was still parked at the scene of the crimes. He made further conflicting statements as to whether Tillman was out of the car and at the scene of the crimes. He said, however, that he had been lying when he so stated.

Franklin Johnson testified that as they left Mounds, the revolver was in the front seat of the car, and that he had the rifle in the back seat. He related that while stopped for gas there was a conversation concerning theft of a white Lincoln Continental, but he could not remember "who said what" and thought it might have been his suggestion. He said that Tillman was driving, and when they reached the rest stop at Tolono, where the car was sitting, Allen said they needed another car because their car was too crowded. He said neither Mims nor Tillman said anything. After they passed the rest area Tillman turned the car around and went back south past the rest area. Allen and he got out with the revolver and the rifle. After they got out their car was driven north. He and Allen then ordered the two people to get out of the car at the rest area, took their wallets and car keys. Johnson stated he (Johnson) said, "we got to kill them." Johnson then shot the woman. Allen shot the man. After the shootings Allen and Johnson got in the car, turned it around, drove north, and caught up with Tillman and Mims.

Johnson testified that after catching up with the other car, Tillman got out of it, and Johnson gave him $2.00 and told Tillman to give him his jacket. Johnson said the car Tillman and Mims were in was north of the place it had been when he got out of it. He said that he and Allen continued north on Route 45 toward Chicago, until they came to a roadblock. They left the car and separated. Johnson spent the night in a garage and was awakened by State Police. Johnson also testified that he didn't tell Tillman or Mims that he had taken money from the people at the rest area or that he had killed the woman. He also said that he did not tell Tillman or Mims that he intended to commit any robbery. Likewise, he said he did not tell them that he intended to steal the parked car. He further said that neither Tillman nor Mims got out of the Mustang car, and that it was parked down the road from the rest stop. When asked about the $2.00 given Tillman, Johnson wasn't certain whether it came from the money taken from the woman's wallet or from other sources.

George Menard, the man who was in the car at the rest area and who was shot, testified. He stated that after work on the evening of September 8, 1968, he and Beatrice Smith left Chicago for Mississippi; that at approximately a quarter to three in the morning they stopped at the

rest area on Route 45; that he got out of the car and took blankets out of the trunk; and that he walked up to the window to hand Mrs. Smith a blanket. Two men "jumped" him. He stated he didn't see any car come up, but that two men came upon him from behind the tree or drum. He stated they took his wallet which contained seven twenties and a ten. The men were shouting they would kill him. They took the currency out of Mrs. Smith's purse—three twenties and a five. The shorter of the two men kept saying, "I'm going to kill him." He put the gun up to Menard's face. Then the taller man said, "I'm going to kill him", and shot him in the face. Menard fell and the man shot him five times. Menard stumbled over a fence, fell down and couldn't get up. Then he heard the car start and leave. When Menard got up and went to Mrs. Smith he realized she was dead. He then walked down the railroad tracks to a laundromat where he called the police.

Menard testified that he knew he had seven twenties and a ten in his wallet, and that he knew the numbers of some of the bills. He also said that he knew Mrs. Smith had a five and three twenty-dollar bills. He said that neither he nor Mrs. Smith had any dollar bills.

The evidence produced at the trial does not show that the defendants Tillman and Mims participated in the shootings or the killing, or in the robbery. In fact, the evidence shows they were not present at the time and place of the acts of Allen and Johnson which constituted robbery, attempted murder and murder. Therefore, their convictions rest upon circumstances which must prove their soliciting, aiding, abetting, agreeing or attempting to aid the others in the planning or commission of the offenses with intent to promote or facilitate the commission of the offenses.

■■ As was stated in *People v. Littleton*, 113 Ill.App.2d 185, 189 (252 N.E.2d 77, 79 (1st Dist. 1969)):

"A person may aid or abet without actively participating in the overt act or acts and evidence that the accused attaches himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common illegal purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture. (People v. Rybka, 16 Ill2d 394, 158 NE2d 17 [(1959)]; People v. Bracken, 68 IllApp2d 466, 216 NE2d 176 [(1st Dist. 1966)].) * * *."

■■ Under section 5-2(c) of the Criminal Code, the State must prove beyond a reasonable doubt three propositions: (1) That defendants solicited, aided, abetted, agreed or attempted to aid another person in planning or commission of the offenses; (2) that this participation must have taken place either before or during the commission of the offenses;

and (3) that it must have been with the concurrent, specific intent to promote or facilitate the commission of the offenses. *People v. Ramirez,* 93 Ill.App.2d 404, 236 N.E.2d 284 (1st Dist. 1968).

As was stated in the *Ramirez* case (*supra,* at 410-411 (236 N.E.2d at 288)):

"The statute also makes it clear, we think, that the legislature did not intend to establish criminal responsibility simply through guilt by association—a thoroughly discredited doctrine. Uphaus v. Wyman, *360 US 72, 79* [79 S. Ct. 1040, 3 L. Ed. 2d 1090 (1959)], rehearing denied 361 US 856 [80 S. Ct. 40, 4 L. Ed.2d 95 (1959)]. . . ."

The evidence in this case fails to show any intent of defendants to engage in criminal activity with the perpetrators of the crimes, Allen and Johnson. In fact, there is evidence that defendants were unwilling to join or assist in robbing a filling station and stealing a car at a place prior to the rest area where Allen and Johnson later committed the crimes.

The uncontradicted testimony of all the parties, except for the contradictions by Allen in his own testimony, was that nothing was said between the parties concerning the theft of the car at the rest area, and that there was no agreement to steal it. Likewise, except for contraditions by Allen, the evidence shows that defendants were not at the rest area when the robbery, attempted murder and murder were performed by Allen and Johnson, and that defendants were never told that these crimes had occurred. The mere presence of the defendants at or in the vicinity of the scene of the crimes was not culpable. *People v. Barnes* (1924), 311 Ill. 559, 143 N.E. 445. Indeed, even consent or knowledge by the defendants that crimes were being committed—neither of which is established by this record—would not constitute aiding or abetting. *People v. Dalton* (1934), 355 Ill. 312, 189 N.E. 265; *People v. Washington* (1st Dist. 1970), 121 Ill.App.2d 174, 257 N.E.2d 190. Allen gave at least three different accounts of the incident, so that little reliance can be placed on his testimony. The testimony of an accomplice-witness is subject to grave suspicion and should be acted upon with great caution. *People v. Cassler* (1928), 332 Ill. 207, 163 N.E. 430. Allen's testimony was inconsistent with that of Johnson as well as the statements of the defendants.

While the State attempted to prove that defendants shared in the proceeds of the robbery in that they received two one-dollar bills, which allegedly came from the victims of the robbery and murder, the evidence wholly failed to establish this contention. The testimony of George Menard, one of the victims of the robbery, as to the denominations of the bills he and the other victim, Beatrice Smith, had, would seem to

completely negate this contention. In any event, the evidence does not establish beyond a reasonable doubt that defendants shared in the proceeds of the crime.

At most, an inference may be drawn in this case that defendants had knowledge that a crime or crimes might be committed or had been committed. Such knowledge, if any, would have come only from the fact of stopping near the rest area where a car was parked, possession of guns by Allen and Johnson, and the sounds and confusion defendants heard occurring at the rest area. This evidence, however, falls far short of "affirmative act(s)" necessary to render one a principal. *People v. Shields* (1955), 6 Ill.2d 200, 207 (127 N.E.2d 440, 444).

■■ The evidence in this case fails to prove beyond a reasonable doubt not only the requisite intent, but it also fails to prove any acts of the defendants of aiding or abetting, or agreeing or attempting to aid in the planning or commission of the offenses committed by Allen and Johnson.

■■ In view of the conclusions which we have expressed on the failure of proof, it becomes unnecessary for us to pass on the other contentions raised. Moreover, it is not for us to pass upon the desirability of the felony-murder statute as that is a subject for legislative determination.

The judgments of the circuit court should be reversed.

Judgment reversed.

SMITH, P. J., concurs.

TRAPP, J., dissenting:

The convictions should be affirmed. There is substantially no dispute as to the following facts most of which were noted in record comments of the trial judge. As they were driving toward the place of this crime there was conversation amongst the occupants of the car about getting another car. When the Pontiac was subsequently observed parked at the side of the highway, Allen suggested getting it and Tillman, the driver, stopped the car, turned it around and drove back to or passed the point where the Pontiac was parked. The record shows no objection or opposition as to any part of this return, and it shows no coercion or persuasion of these defendants was necessary. When Allen and Johnson alighted from the car, one took the rifle and the pistol was handed to the other by one of the defendants. Tillman's statement was that he knew Allen and Johnson were going back to get the car, while Mims said that they were going back to rob. Tillman and Mims remained in or with the car, and after they heard several shots fired they

continued to wait. When the Pontiac was started up these defendants pursued it, flashing the lights and sounding the horn as a signal for the Pontiac to stop. Tillman got out, went to the Pontiac and got some money. His statement is that he then said to those in the Pontiac, "What are you going to do, just leave us out here?". The record further shows that at this time Johnson said, "If each of us don't get to Chicago in two hours or so, then the other one got caught. Do you understand what I mean?". The defendants then drove on to Chicago, ultimately passing through the roadblock which had stopped Allen and Johnson.

The defendants' disclaimer of participation in the crime and that they did not want to be a part of it must be measured in the light of their acts, vis-a-vis the standards set forth in many opinions of our courts of review. The stated facts disclose conduct of affirmative quality as distinguished from the "mere presence" or "negative acquiescence". *The People v. Hobbs,* 400 Ill. 143, 79 N.E.2d 202; *The People v. Powers,* 293 Ill. 600, 127 N.E. 681, and *The People v. Wrenn,* 29 Ill.2d 581, 195 N.E.2d 154.

If one voluntarily attaches oneself to a venture with knowledge of proposed illegal acts, there is an inference that such one joins in a common purpose and such inference may we considered with the other evidence that one consents to the crime, thereby aiding and abetting the offense. *The People v. Rybka,* 16 Ill.2d 394, 158 N.E.2d 17.

In *Rybka,* it was contended that the defendant's conduct was "negative acquiescence". Conviction was sustained as to Rybka who drove the car to the scene with knowledge of the purpose to "roll a man" or "get a negro". In *People v. Bracey,* 110 Ill.App.2d 329, 249 N.E.2d 224, a conviction of murder was affirmed when defendant returned with others to an apartment with the purpose to prevent a beating administered by the victim of the subsequent shooting. In *The People v. Richardson,* 32 Ill.2d 472, 207 N.E.2d 478, defendant joined with others to cross the street while some of the latter attacked and robbed. Upon the contention that the evidence did not show common design or purpose the court held that there need not be words of agreement, but that the purpose can be drawn from the circumstances surrounding the acts. In *The People v. Wrenn,* 29 Ill.2d 581, 195 N.E.2d 154, conviction was affirmed where defendant went with a youth gang, one of whom had a rifle, to hunt for another gang. The court reached the conclusion that the defendant subscribed to the unlawful venture. See also *The People v. Hill,* 39 Ill.2d 125, 233 N.E.2d 367. When Tillman drove back to the place where the Pontiac was parked and Mims went along, neither protesting nor objecting and without evidence of coercion, they did

affirmative acts of attaching themselves to the venture with knowledge of the proposed illegal acts.

Again, if a person is present at the commission of a crime without disapproving or opposing it, such conduct may be considered with other circumstances to reach a conclusion that he assented to the criminal acts, lent approval and thereby aided and abetted the crime. *People v. Watson,* 110 Ill.App.2d 343, 249 N.E.2d 293; *The People v. Nugara,* 39 Ill.2d 482, 236 N.E.2d 693. In *People v. Bracken,* 68 Ill.App.2d 466, 216 N.E.2d 176, defendant remained in the car 300 feet from the scene of the assault and rape but made no protest or effort to protect the victim—did not leave the scene or call the police. The conviction was affirmed. In *The People v. Powers,* 293 Ill. 600, 127 N.E. 681, defendant joined others for a ride in a car. There was a revolver on the seat. Defendant remained waiting in the car with the driver while three companions took the revolver and robbed a man at a place some 50 feet distant. The court found that there was a justifiable inference of a common understanding in stopping the car to commit the robbery.

The evidence is clear that after Allen and Johnson left the car with the weapons to go to the Pontiac, the defendants waited. At this point no person had been seen at the Pontiac. If the Pontiac was disabled or could not be driven, Allen and Johnson would need transportation. Johnson testified that he had known Mims for 9 years and Tillman for 7 years, and that when he got out of the car he knew that they would wait for him. Such waiting belies the contention that Tillman and Mims were fearful of the others and were only seeking the earliest opportunity to escape. In *The People v. Hobbs,* 400 Ill. 143, 79 N.E.2d 202, the defendant drove two companions to the scene, drove around the block twice while waiting, and then picked them up following the robbery. The conviction was affirmed.

Subsequent acts are competent to prove participation in a crime. *The People v. Kolep,* 29 Ill.2d 116, 193 N.E.2d 753; *People v. Bracken,* 68 Ill.App.2d 466, 216 N.E.2d 176. After the defendants heard the several shots they continued to wait until the Pontiac was driven off. They did not disassociate themselves from Allen and Johnson, but rather pursued them and stopped them to get some money. That the first association continued is shown in Tillman's inquiry of Allen and Johnson whether they were going off and leave them. Such conduct supports a justifiable inference of common understanding. Again, an understanding of a subsequent meeting is reasonably inferred from Johnson's statement to Tillman that if each car did not get to Chicago in two hours, the other had been caught.

The conclusion that the two dollars Tillman received from Johnson was not part of the stolen money is not actually supported in the record. Menard testified as to the denominations of the bills he gave to the murder victim, but he also testified that the latter planned to go to the hairdresser and that he did not, in fact, know what change or small currency she possessed at the time of the shooting. Johnson testified that he had no money prior to the robbery. There is no doubt that Tillman asked Allen and Johnson for money. Whether the sum given him was from the victim or from Johnson is essentially fortuitous for Tillman did not specify whose money he wanted.

No conduct shown in the record is consistent with the innocence of these defendants. They did not communicate their withdrawal from the venture to Allen and Johnson. *The People v. Rybka,* 16 Ill.2d 394, 158 N.E.2d 17. They did not undertake to escape from Allen and Johnson after the latter walked away to the Pontiac car, and they made no effort to escape after they heard the shots fired. They made no effort to call the police and did nothing to aid the victim after they heard the shots fired. Such are proper factors to be considered upon the issue of common purpose or of innocence. *The People v. Kolep,* 29 Ill.2d 116, 193 N.E.2d 753; *People v. Bracken,* 68 Ill.App.2d 466, 216 N.E.2d 176, and *People v. Johnson,* 61 Ill.App.2d 319, 210 N.E.2d 344.

In each of the cases we have cited it was contended that the defendant did not participate in the offense and that there was no proof of guilt beyond a reasonable doubt. In each the conviction was affirmed.

The sum of the admitted conduct of the defendants is a more precise measure of their accountability than their respective statements of desire to avert criminal conduct and to escape from the misdeeds of Allen and Johnson. Under such circumstances determination of the credibility of the witnesses is not a genuine issue.

The principal opinion concludes that the conduct of the defendants constituted "mere presence" or "negative acquiescence" as to the crimes of Allen and Johnson. In the authorities cited in the opinion the conduct was of much different quality than here. In *The People v. Barnes,* 311 Ill. 559, 143 N.E. 445, a woman was charged with theft of a car. The evidence is that she was riding as a guest when the car ceased to function. While she waited her companion went for aid and returned with a car which proved to be stolen. At the most, she suspected that it was stolen. There was, however, no evidence of an affirmative act prior to or at the time of the theft. In *The People v. Dalton,* 355 Ill. 312, 189 N.E. 265, defendant loaned a shotgun to others who committed murder at some later date. The other defendants denied that Dalton knew of a scheme to murder. In *People v. Washington,* 121 Ill.App.2d 174, 257 N.E.2d 190,

defendant came upon a scene of a gang rape. He was not identified as a member of the gang. The only evidence was that he stayed to persuade his cousin to leave the scene, and fled when the police came. The court concluded that there was no evidence that defendant facilitated the rape, or any common scheme. In *People v. Ramirez,* 93 Ill.App.2d 404, 236 N.E.2d 284, defendant asked to stay in the apartment of another. There he observed a man tied, but there was no evidence to establish when the man died. The court determined that there was no evidence of affirmative acts by defendant prior to or during the commission of the murder.